Terrance E. BABB, M.D., Appellant

v.

CENTRE COMMUNITY HOSPITAL, Geisinger Clinic, Penn State Geisinger Health System, Robin E. Oliver, and Michael J. Chmielewski, Appellees.

Superior Court of Pennsylvania.

Argued Feb. 1, 2012.

Filed June 14, 2012.

Reargument Denied Aug. 9, 2012.

---

Gantman, J., concurred in the result.

Andrew W. Barbin, Mechanicsburg, for appellant.

John L. McIntyre, Hollidaysburg, for Centre Com. Hospital, appellee.

Douglas J. Smillie, Center Valley, for Chmielewski, Geisinger Clinic, Penn State Geisinger and Oliver, appellees.

BEFORE: GANTMAN, ALLEN, and MUNDY, JJ.

OPINION BY MUNDY, J.:

Appellant, Terrance E. Babb, M.D. (Dr. Babb), appeals from the May 12, 2011 order granting summary judgment in favor of Centre Community Hospital (CCH), Geisinger Clinic (Geisinger), Penn State Geisinger Health System (PSGHS), Robin E. Oliver, M.D. (Dr. Oliver) and Michael J. Chmielewski, M.D. (Dr. Chmielewski). After careful review, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

The relevant facts and procedural background of this case, in the light most favorable to Dr. Babb, are as follows. In June 1995, Geisinger offered, and Dr. Babb accepted, employment as a staff physician for their OB/GYN Clinic in State College.[1] Dr. Babb commenced his employment on September 1, 1995. At around the same time, Dr. Oliver was also hired as a staff physician for the OB/GYN Clinic. In July 1996, Geisinger hired Dr. Chmielewski as a third staff physician at the Clinic. Over time, the working relationship between Dr. Babb and his two colleagues deteriorated. Dr. Babb made professional complaints against Dr. Chmielewski. Subsequently, Dr. Oliver, Dr. Chmielewski and others made professional complaints against Dr. Babb. Pursuant to a routine annual performance review process, Dr. Babb was recommended for reappointment. However, the discord and additional targeted performance reviews culminated in Geisinger's decision to terminate Dr. Babb's employment.

To that end, on or about May 16, 1997, Dr. Charles Maxin, Senior Vice President for Clinical Operations, and Dr. David Wolfe, Medical Director for Geisinger Medical Group, met with Dr. Babb and requested his resignation. Dr. Babb refused to resign and he was fired that same day. The termination was confirmed by letter dated May 19, 1997, which indicated in part that quality of care concerns were at issue. Accordingly, Dr. Babb was afforded a hearing pursuant to Geisinger's Peer Review Fair Hearing Plan (Fair Hearing Plan) rather than the Involuntary Review Process otherwise provided for by Geisinger's employee policy #412.[2] By

---

1. The parties dispute whether Dr. Babb was a contract or at-will employee.

2. Dr. Babb contends the wrong review procedure was employed since the stated patient care concerns were pretextual and no true patient care issues existed. The pertinent language defining the respective procedures follows.

Geisinger Clinic is charged with the responsibility to review any reports of information which raise questions regarding the professional competence of any physician or dentist which affects or could affect the health and welfare of Geisinger clinic patients. In addition, Geisinger Clinic is contractually obligated to provide credentials and quality assurance review of Geisinger Health Plan physicians and dentists, including those not affiliated with the Geisinger system of healthcare. Should the Regional Medical Director or the Clinical Practice Committee of Geisinger Clinic conclude that information received warrants the initiation of a Formal Peer Review Process, the Geisinger Clinic or Geisinger Health Plan physician or dentist involved will be entitled to notice of a proposed action and hearing by a Hearing Committee selected as set forth herein. The recommendation of such a Hearing Committee for professional review action against a Geisinger Clinic or Geisinger Health Plan physician or dentist shall be submitted to the Geisinger Clinic Clinical Practice Committee for final decision. The right to a hearing under this peer review process is strictly limited to cases in which professional review action is necessary to address quality of care concerns arising out of medical care provided to patients by Geisinger Clinic or Geisinger Health Plan physicians or dentists. The hearing process outlined herein has no application to decisions by Geisinger Clinic management to terminate the employment of members of its professional staff or Geisinger Health Plan physicians or dentists for business reasons, including but not limited to, elimination or reduction of staff posi-

letter dated June 17, 1997, Counsel for Geisinger advised Dr. Babb of the reasons for termination and advised him of his procedural rights under the Fair Hearing Plan.

The Fair Hearing proceeded with five sessions from November 17, 1997 to February 16, 1998. During the proceedings, several witnesses testified and exhibits were presented. Dr. Babb's counsel cross-examined the witnesses. Dr. Babb did not present any additional witnesses on his own behalf. On March 20, 1998, the Hearing Committee made the following findings.

### III. FINDINGS

1. The evidence *supported*, the allegation that Dr. Babb had been unable to work cooperatively and effectively with his colleagues and office staff.

2. The evidence *supported* the allegations that Dr. Babb was constantly delinquent in his record keeping, possibly altered medical records, failed to abide by the offices' "lab pending" policy and failed consistently and properly to maintain and document his medical charts.

3. The evidence *supported* the allegations (with respect to certain medical charts brought to the attention of the committee), that irregularity in medical care provided by Dr. Babb occurred including, failure to properly diagnose, performance of inappropriate operative procedures, lack of proper pre-operative evaluation in urological procedures and antiquated approaches to pelvic examinations.

4. Based on Findings 2 and 3 above, the Committee concludes that Dr. Babb's conduct had an adverse impact on patient care.

Geisinger Defendants' Motion for Summary Judgment, 12/10/10, Exhibit J, Report of Hearing Committee at 7 (emphasis in original). The Clinical Practice Committee, in a letter dated May 28, 1998, accepted the Fair Hearing Committee's findings and affirmed Dr. Babb's termination.

As a consequence of the Fair Hearing results, Geisinger submitted a mandated National Practitioner Data Bank (NPDB) Report on June 2, 1998. *See Jacksonian v. Temple University Health System Foundation,* 862 A.2d 1275, 1278 (Pa.Super.2004) (noting the Health Care Quality Improvement Act (HCQIA)[3] "requires hospitals to report information to the Data Bank, and to request information from the Data Bank when physicians join a hospital and every two years thereafter. *See* 42 U.S.C. §§ 11133, 11135"). Geisinger's report included the following statements.

tions or decisions surrounding the renewal of existing contractual relationships.
Geisinger Defendants' Motion for Summary Judgment, 12/10/10, Exhibit F, Geisinger Clinic-wide Quality Improvement Program—Preamble.
GEISINGER CLINIC GUIDELINES FOR HEARING AND
REVIEW FOR INVOLUNTARY TERMINATION OF
EMPLOYMENT FOR PROFESSIONAL CLINICAL STAFF
1) Before a Professional Clinical Staff member's employment can be involuntarily terminated for reasons unrelated to the quality of care to patients[1] by the

member, the physician manager seeking to effect the termination shall review the underlying circumstances with the site Medical Director and the Regional Medical Director.

. . .

1 Terminations related to quality of care to patients shall follow the Peer Review Fair Hearing Plan provided under the Geisinger Clinic-wide Quality Improvement Program.
*Id.,* Exhibit G, Geisinger Clinic Operations Manual, Policy # HR–412 (footnote in original).

**3.** 42 U.S.C.A. § 11101 *et seq.*

This classification is being utilized although the actual adverse action is a termination of employment (as opposed to a pure revocation of privileges) based upon unprofessional conduct, etc. Penn State Geisinger Clinic terminated the practitioner's employment on May 16, 1997 subject to an internal review. The termination was based upon concerns regarding the practitioner's professional conduct and clinical competency and/or judgment. In addition to certain, specific incidents, the termination was also, based upon the practitioner's chronic failure to properly and promptly complete medical records and patient charts. The decision to terminate was upheld by a hearing committee. The Clinical Practice Committee accepted the recommendation of the Hearing Committee and affirmed/finalized the decision to terminate the practitioner's employment. The Hearing Committee determined· that the conduct of the practitioner could have an adverse impact on patient care.

*Id.*, Exhibit L, NPDB Adverse Action Report.

During his employment with Geisinger, Dr. Babb enjoyed clinical privileges with CCH. Upon his termination by Geisinger, those privileges were withdrawn because Dr. Babb no longer had malpractice insurance coverage. Dr. Babb subsequently obtained employment in Clearfield County.

On May 1, 1998, Dr. Babb initiated the instant action in the Court of Common Pleas of Centre County by filing a writ of summons against Geisinger, Dr. Oliver, and Dr. Chmielewski (Geisinger Defendants).[4] On July 24, 1999, Dr. Babb reapplied for clinical privileges with CCH.[5] On November 4, 1999, Dr. Babb filed a complaint in United States District Court for the Middle District of Pennsylvania against Geisinger, CCH, and others, alleging, *inter alia,* discrimination, antitrust violations, breach of contract, civil conspiracy to deny privileges, and interference with contract.[6]

Meanwhile, CCH, preparing for consideration of Dr. Babb's reapplication, received a copy of the NPDB Adverse Action Report filed by Geisinger. To further assess the basis for the report, CCH requested receipt of the information underlying the report from Geisinger in order to make its own independent evaluation. Geisinger refused to release information unless Dr. Babb signed a blanket release.[7] Dr. Babb refused to do so. None of the other information available to CCH regarding Dr. Babb's competence and qualifications either prior to or subsequent to the June 2, 1998, NPDB Adverse Action Report was negative. Nevertheless, the

4. PSGHS and CCH were not named defendants on the May 1, 1998 writ. In the context of this opinion, our discussion of issues relating to Geisinger shall include PSGHS unless otherwise noted.

5. The timing of Dr. Babb's re-application was affected by non-compete conditions attendant to his original employment with Geisinger. *See* Geisinger Defendants' Summary Judgment Motion, 12/10/10, Exhibit A, Geisinger Clinic—Physician Network Practice Agreement, 6/30/95.

6. Although Dr. Babb's reapplication for clinical privileges with CCH was still pending when the federal action was filed, his claims against CCH were premised on the hospital's failure to act in a timely manner.

7. Dr. Babb signed a release at the time of his re-application that authorized release of information to CCH by other institutions and provided immunity if the release was made "in good faith and without malice." Dr. Babb's Response in Opposition to Summary Judgment Motion of Defendants, 3/15/11, at 20, Exhibit 125. Geisinger insisted on a release that did not contain the qualifying "in good faith and without malice" language. *Id.* at 54, Exhibit 51.

Credentials Committee for CCH recommended conditional acceptance citing concerns about the NPDB report and Dr. Babb's working relationship with the hospital's institutions and personnel. CCH's Medical Executive Committee, after considering the Credentials Committee recommendation and reservations, ultimately did not recommend acceptance of Dr. Babb's reapplication. CCH advised Dr. Babb of the Medical Executive Committee's decision on December 11, 2000 and of his rights to a Fair Hearing. Dr. Babb did not request a hearing. On January 29, 2001, in consideration of the Medical Executive Committee's recommendation and Dr. Babb's decision not to request a hearing, CCH's Board of Directors voted not to grant Dr. Babb's reapplication for clinical privileges.

In conjunction with this action, CCH submitted a required NPDB report. The reported stated the following.

Adverse Action Classification Code: DENIAL OF CLINICAL PRIVILEGES (1650)
Date Action Was Taken: 01/29/2001

. . .

Clinical privileges were denied based on adverse reports of the physician's professional competence and professional conduct, either or both of which could adversely affect the health or welfare of patient care at Centre Community Hospital.

. . .

Basis for Action: UNPROFESSIONAL CONDUCT (10) INCOMPETENCE (11)
CCH's Motion for Summary Judgment, 12/10/10, Exhibit T.

Dr. Babb sought review from the U.S. Department of Human Services, which raised concerns about the sufficiency of the NPDB report resulting in a corrected report entered June 27, 2002, as follows.

CLINICAL PRIVILEGES WERE DENIED BASED UPON: Information contained in a national practitioner data bank report filed by the practitioner's former employer advising that the practitioner's employment had been terminated based upon concerns regarding the practitioner's professional conduct and clinical competency and/or judgment that could have an adverse impact on patient care; a letter received by the Hospital from practitioner's former employer referring the hospital to the data bank report in response to credentials committee reference check with former employer; and practitioner's statements during his interview with the Hospital's credentials committee. The Hospital believed: that practitioner's appointment to the active medical staff would result in an adverse effect on the quality of the medical care provided to OB/GYN patients because practitioner failed to provide evidence that contradicted his former employer's data bank adverse assessment; practitioner's interview statements to the hospital's credentials committee reflected mistrust and animosity towards members of Hospital's OB/GYN Department, Hospital's medical staff leadership and administration; and, practitioner's expressed animosity towards other members of the medical staff including charges against other members of the medical staff of unethical practice would preclude appropriate and necessary working relationships with the medical staff including quality improvement. The Hospital determined that granting privileges to practitioner would be disruptive to the operations of the hospital.
Basis for Action: UNPROFESSIONAL CONDUCT (10)
Dr. Babb's Response in Opposition to Summary Judgment Motion of Defendants, 3/15/11, at 553, Appendix III.

On September 14, 2001, the District Court, with Judge Muir presiding, granted defendants' motions for summary judgment, terminating all federal claims but declining to address Dr. Babb's state claims. Subsequently, the defendants in the federal action sought attorney fees from Dr. Babb, alleging his federal causes of action were frivolous. At the hearing on defendants' motion for attorney fees, Judge Muir permitted Dr. Babb to submit evidence of the basis for his suit, as it pertained to his state of mind in commencing the action. On April 30, 2002, Judge Muir made extensive findings of fact and entered an order denying the motion for attorney fees. *Id.* at 450, Appendix III.

Meanwhile, on October 31, 2001, Dr. Babb filed a seven-count complaint in the still pending instant action against the Geisinger Defendants.[8] On January 25, 2002, Dr. Babb filed an amended six-count complaint, adding CCH as a party and alleging the following causes of action.[9] As against Geisinger, Dr. Babb sought monetary damages, alleging breach of contract (Count I), and illegal retaliation in violation the Pennsylvania Human Relations Act (Count VI). As against all defendants, Dr. Babb sought monetary damages, alleging defamation (Count II), intentional interference with contractual relations (Count IV), and civil conspiracy (Count V). In Count III, Dr. Babb also sought injunctive relief against Geisinger and CCH relative to the alleged defamation. *See* Dr. Babb's Amended Complaint, 1/25/02. The defendants filed various preliminary objections, which the trial court subsequently overruled. On

June 4, 2003, CCH filed its answer and new matter to Dr. Babb's amended complaint. On January 6, 2004, the Geisinger Defendants filed their answer and new matter.

On December 10, 2010, the Geisinger Defendants and CCH each filed a motion for summary judgment. The Geisinger Defendants and CCH sought summary judgment or partial summary judgment on the following grounds. Relative to Counts V and VI of Dr. Babb's amended complaint, civil conspiracy and retaliation respectively, the Geisinger Defendants alleged the claims were barred by *res judicata* and collateral estoppel based on previous holdings of the District Court. CCH raised the same issues relative to Count V as well as invoking the statute of limitations and failure of sufficient proof. Relative to Dr. Babb's claim for monetary damages in Counts I, II, IV, V, and VI, the Geisinger Defendants and CCH aver they are covered by the HCQIA and Pennsylvania Peer Review Protection Act (PPRPA)[10] immunity. Relative to Count I, breach of contract, the Geisinger Defendants maintain that, as a matter of law, Dr. Babb was an at-will employee, precluding a contract based claim or, in the alternative, that Dr. Babb failed to allege any breach to his detriment. Relative to Counts II and III, the Geisinger Defendants and CCH contend Dr. Babb has failed to make out a case for defamation as a matter of law since the alleged statements fall outside the statute of limitations, involve expressions of opinion, or are privileged. On those counts, CCH ad-

8. Appellant added PSGHS to the caption on the complaint without notice to any of the parties or requesting leave of the trial court. In the complaint Appellant stated, "it is believed and averred that Geisinger Clinic was acquired by Penn State Geisinger Health System (PSGHS), and was known as the Penn State Geisinger Clinic (PSGC) during the pe-

riods relevant to this Complaint." Appellant's Complaint, 10/31/01, at ¶ 2.

9. The trial court granted leave for the amended complaint on September 6, 2002.

10. 63 P.S. § 425.1–425.4.

ditionally claimed Dr. Babb failed to raise an issue of material fact that the statements were capable of defamatory meaning or were untrue. Relative to Dr. Babb's Count III request for injunctive relief, the Geisinger Defendants and CCH allege the relief requested is unavailable as a matter of law because the Data Bank Report at issue was justified, privileged and mandated and an adequate remedy exists at law. Relative to Count IV, interference with contract, the Geisinger Defendants and CCH aver that Dr. Babb has failed to offer evidence of improper motive, intention or justification or that there was a reasonable probability that privileges would have been granted by CCH. CCH also alleged the application of the statute of limitations relative to this count. Finally, the Geisinger Defendants sought summary judgment relative to PSGHS since the entity no longer exists. *See* Geisinger Defendants' Motion for Summary Judgment, 12/10/10; CCH's Motion for Summary Judgement, 12/10/10.

On May 12, 2011, the trial court issued an opinion and order granting summary judgment in favor of all defendants as to all counts and dismissed all claims with prejudice. The trial court based its grant of summary judgment for the counts seeking damages on the Geisinger Defendants' and CCH's claims of HCQIA immunity. In addition, the trial court noted, "due to the finding that the parties acted properly in their actions against Dr. Babb, the [trial c]ourt finds that [i]njunctive relief is improper and unavailable." Trial Court Opinion, 5/12/11, at 7. On June 9, 2011, Dr. Babb filed a timely notice of appeal.[11]

On appeal, Dr. Babb raises the following issues for our review.

1. Whether the [t]rial [c]ourt erred in failing to apply the Summary Judgment standard in making credibility determinations in relation to the dispute, rather than viewing the evidence in the light most favorable to the non-moving party as required.

2. Whether the [t]rial [c]ourt erred in failing to apply the correct standards for HCQIA or related privileges and in failing to apply inferences in favor of non-moving parties as required regarding due process, bad faith and substantive issues relating to alleged immunity.

3. Whether the [t]rial [c]ourt erred as a matter of law in failing to address the breach of contract and interference with contractual relations claims.

4. Whether the [t]rial [c]ourt erred in failing to address defamation claims regarding unsupported content in NPDB Reports and general defamatory statements to third parties.

5. Whether the [t]rial [c]ourt committed errors of law by failing to give effect to the findings of fact in the prior federal litigation.

6. [Whether t]he [t]rial [c]ourt erred in failing to find that there was sufficient evidence to demonstrate bad faith, defamation, and conspiracy as to the denial of privileges and NPDB report of Geisinger Defendants.

Dr. Babb's Geisinger Defendants' Brief at 3.[12]

All of Dr. Babb's issues present arguments supporting his contention that the

---

11. Dr. Babb and the trial court have complied with Pa.R.A.P. 1925. We note, for purposes of Rule 1925(a), the trial court referenced its May 12, 2011 opinion as containing the reasons for its determination.

12. Dr. Babb filed separate briefs, respectively addressing his claims against CCH and the Geisinger Defendants, which contain identical statements of questions presented on appeal. We shall reference the briefs as Dr. Babb's Geisinger Defendants' Brief, and Dr. Babb's CCH Brief, respectively.

trial court erred in granting the summary judgment motions filed by the Geisinger Defendants and CCH. In reviewing a trial court's grant of summary judgment, we are guided by the following scope and standard of review.

> A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.
>
> > In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa. R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will review the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.
> >
> > *ADP, Inc. v. Morrow Motors Inc.*, 969 A.2d 1244, 1246 (Pa.Super.2009) (quoting *Shepard v. Temple University*, 948 A.2d 852, 856 (Pa.Super.2008)).

*Foster v. UPMC South Side Hosp.*, 2 A.3d 655, 660 (Pa.Super.2010).

> Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a prima facie cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

*Reeser v. NGK North American, Inc.*, 14 A.3d 896, 898 (Pa.Super.2011), quoting *Jones v. Levin*, 940 A.2d 451, 452–454 (Pa.Super.2007) (internal citations omitted).

Instantly, both CCH and the Geisinger Defendants claim immunity under the HCQIA. The trial court agreed and, as noted, based its grant of the defendants' motions for summary judgment on its determination that Dr. Babb did not provide sufficient facts to overcome the presumption of immunity. *See* Trial Court Opinion, 5/12/11. The HCQIA provides, in pertinent part, as follows.

### § 11111. Professional review

(a) In general

(1) Limitation on damages for professional review actions

If a professional review action (as defined in section 11151(9) of this title) of a professional review body meets all the standards specified in section 11112(a) of this title, except as provided in subsection (b) of this section—

**(A)** the professional review body,

**(B)** any person acting as a member or staff to the body,

**(C)** any person under a contract or other formal agreement with the body, and

**(D)** any person who participates with or assists the body with respect to the action,

shall not be liable in damages under any law of the United States or of any

State (or political subdivision thereof) with respect to the action.

. . .

(2) Protection for those providing information to professional review bodies

Notwithstanding any other provision of law, no person (whether as a witness or otherwise) providing information to a professional review body regarding the competence or professional conduct of a physician shall be held, by reason of having provided such information, to be liable in damages under any law of the United States or of any State (or political subdivision thereof) unless such information is false and the person providing it knew that such information was false.

42 U.S.C.A. § 11111.

(9) The term "professional review action" means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action. In this chapter, an action is not considered to be based on the competence or professional conduct of a physician if the action is primarily based on—

. . .

(E) any other matter that does not relate to the competence or professional conduct of a physician.

42 U.S.C.A. § 11151(9).

§ 11112. Standards for professional review actions

(a) In general

For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C.A. § 11112(a).

■ Accordingly, our review of the trial court's grant of summary judgment must account for the presumption of immunity imposed by the HCQIA.

A synthesis of our summary judgment law and the HCQIA reveals that a plaintiff bears the burden of proof in rebutting the presumption that a defendant acted in compliance with § 11112(a). Thus, the entry of summary judgment against a plaintiff will be reversed only if he can establish that there is either a genuine dispute about a material fact or

that he has adduced sufficient evidence so that a jury, examining the totality of the circumstances, could conclude that the plaintiff had rebutted the presumption.

*Manzetti v. Mercy Hosp. of Pittsburgh,* 565 Pa. 471, 776 A.2d 938, 946 (2001). In considering the defendants' motions for summary judgment based on HCQIA immunity, we ask the following: "[m]ight a reasonable jury, viewing the facts in the best light for [plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?" Therefore, [plaintiff] can overcome HCQIA immunity at the summary judgment stage only if he demonstrates that a reasonable jury could find that the defendants did not conduct the relevant peer review actions in accordance with one of the HCQIA standards.

*Singh v. Blue Cross/Blue Shield of Mass., Inc.,* 308 F.3d 25, 32 (1st Cir.2002) (citations omitted).

It is true, as our formulation here of the summary judgment question suggests (asking whether a reasonable jury could find that a defendant did not meet one of the standards for HCQIA immunity), that the statutory scheme contemplates a role for the jury, in an appropriate case, in deciding whether a defendant is entitled to HCQIA immunity. The weight of authority from our sister circuits reflects this proposition.

*Id.* at 33 (collecting cases).

In concluding Dr. Babb failed to overcome the HCQIA presumption of immunity, the trial court reasoned as follows.

The Court finds that there are no genuine issues of material fact as to whether Defendants believed that there were patient quality issues relating to Dr. Babb's employment with Geisinger and his privileges at CCH. There are obviously other issues surrounding the rela-

tionships between Dr. Babb and the administrators and doctors at Geisinger and CCH, but those issues do not negate the fact that there were patient quality issues as well.

Trial Court Opinion, 5/12/11, at 3.

While there may be some doubt that the motives of Geisinger were one hundred percent pure, Geisinger did raise significant questions about the quality of patient care. The Court is not saying that it has determined that Dr. Babb is anything less than a stellar physician, just that the issues Geisinger raised were sufficient to grant them immunity from damages. As such the Court finds that Summary Judgment must be granted as to all Defendants and as to all claims.

*Id.* at 7.

For ease of discussion, we address Appellant's first two issues together. We further divide our discussion of these related issues relative to Geisinger, Drs. Oliver and Chmielewski, and CCH, respectively. In his first issue, Dr. Babb avers the trial court erred in granting the motions for summary judgment by applying an incorrect summary judgment standard, and that the trial court's findings were "subjective rather than objective, as required." Dr. Babb's Geisinger Defendants' Brief at 59. Dr. Babb also avers that the trial court applied an erroneous standard to assess the applicability of HCQIA immunity. Dr. Babb argues,

there was sufficient expert evidence presented that the alleged medical deficiencies were pretextual, retaliatory, and trivial. [The trial court] appears to adopt a "could have had a sufficient apprehension" standard, rather than the "reasonable good faith belief" following a "reasonable good faith effort to deter-

mine the facts" standard actually required by the HCQIA....

*Id.* at 57.

> As detailed in the opinions of Mr. Artz and Dr. Schwartz and [other evidence], there were material issues of fact as to each of the required elements of conditional HCQIA privilege.... Geisinger did not act in furtherance of quality health care, did not make a reasonable effort to determine the facts, were not fair under the circumstances, and did not act based upon reasonable belief that termination of Dr. Babb was warranted.

*Id.* at 56.

▬ We agree, in part, with Dr. Babb's assessment as it pertains to Geisinger. We note first, however, that much of Dr. Babb's analysis and his related references to the record are inapposite to a determination of whether Geisinger's actions accorded with the standards of section 11112(a). Dr. Babb devotes much of his argument to evidence of purported bias, pretextual motives, and bad faith on the part Geisinger. Courts reviewing the applicability of HCQIA immunity have made clear that a party's subjective motivation is irrelevant to the objective test of whether the professional review action was reasonable.

> [T]he HCQIA does not require that participants in the peer review process act with good faith in order to be entitled to a grant of immunity. *See Austin* [*v. McNamara*], 979 F.2d [728], 734 [ (9th Cir.1992) ]; *see also Mathews* [*v. Lancaster Gen. Hosp.*], 87 F.3d [624], 635 [ (3d Cir.1996) ]. In fact, evidence that the peer review process was conducted due to hostility toward the sanctioned physician is "irrelevant to the reason-

ableness standard of § 11112(a)." *Austin*, 979 F.2d at 734.

*Manzetti, supra* at 951.

> In an HCQIA action, plaintiffs are not permitted to introduce evidence of bad faith of the participants in the peer review process. The "reasonableness" requirements of § 11112(a) "create an objective standard, rather than a subjective good faith standard." *Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir. 1992). Thus, the alleged bad faith of the participants in the peer review process is immaterial to determining whether these participants are entitled to immunity under the HCQIA. Rather, the inquiry is whether a person presented with the same information that was placed before the peer review body " 'would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients.' " *Id.* (quoting H.R.Rep. No. 903, 99th Cong., 2d Sess. 10). This inquiry examines the totality of the circumstances. *Imperial v. Suburban Hosp. Assoc., Inc.*, 37 F.3d 1026, 1030 (4th Cir.1994).

*Id.* at 946–947.

▬ Accordingly, the trial court was correct to disregard Dr. Babb's evidence of Geisinger's alleged bias and subjective motivation in assessing whether Dr. Babb had presented sufficient evidence to rebut the presumption of HCQIA immunity. The proper focus for the trial court was whether, viewing all of the information available to it, the peer review body conducted a fair proceeding, made a reasonable effort to obtain the facts and possessed a reasonable belief its action was in furtherance of patient care. *See* 42 U.S.C.A. § 11112(a). Absent such fair proceeding, reasonable effort, or reasonable belief, immunity will not attach.

Instantly, the trial court determined "that there are no genuine issues of material fact as to whether Defendants believed that there were patient quality issues relating to Dr. Babb's employment with Geisinger...." Trial Court Opinion, 5/12/11, at 3. As noted however, to trigger HCQIA immunity it is not enough that the Geisinger Defendants merely believed that patient care issues were implicated, but rather that their belief, and the efforts made to adduce the facts supporting their belief, were reasonable.

To address this question, Dr. Babb proffered two expert reports from Peter A. Schwartz, M.D. (Dr. Schwartz) and Charles I. Artz, Esq. (Attorney Artz), respectively.[13] Dr. Schwartz reviewed the entire record available to the Fair Hearing Committee. Dr. Babb's Response in Opposition to Summary Judgment Motion of Defendants, 3/15/11, at 486 (Report of Dr. Schwartz), Appendix III. His review included the full medical charts of the specific patient files brought to the committee's attention, the full transcripts of testimony, and exhibits presented. *Id.* On the basis of his review, Dr. Schwartz concluded there was no objectively reasonable basis to question patient care as a result of any of Dr. Babb's actions or omissions, and he further concluded that the process employed by the Fair Hearing Committee to adduce the facts was "fundamentally flawed." *Id.* Attorney Artz similarly concluded that the Fair Hearing Committee failed to make reasonable efforts to ascertain the facts necessary to evaluate whether the alleged actions or omissions by Dr. Babb in fact implicated patient care. *Id.*

at 495 (Report of Atty. Artz), Appendix III.

■ We note, [t]he requirement that the peer review body expend a "reasonable effort to obtain the facts" does not require that the investigation be flawless. Rather, it connotes that the investigation must be conducted in a sensible fashion.

*Manzetti, supra* at 948. Nevertheless, we conclude the proffered reports and opinions from Dr. Babb's experts and the fair inferences derived therefrom are sufficient to raise a material issue of fact as to whether Dr. Babb has met his burden to show that either the peer review process or Geisinger's belief that its actions were in furtherance of patient care was unreasonable, thus precluding summary judgment based on HCQIA immunity. *See Manzetti, supra* at 946; *Singh, supra* at 32. In light of that issue, it is for a jury to decide whether Geisinger is entitled to HCQIA immunity. Accordingly, we conclude the trial court erred in granting summary judgment in favor of Geisinger on the basis of HCQIA immunity.

■ We next consider the position of Dr. Oliver and Dr. Chmielewski relative to the applicability of HCQIA immunity. These defendants' positions are different from that of Geisinger in that their immunity derives from section 11111(a)(2), covering individuals who provide information to professional review bodies. *See* 42 U.S.C.A. § 11111(a)(2). As such, their actions are not subject to the qualifications of fairness and reasonableness imposed on the professional review body by section 11112(a). Rather, section 11111(a)(2) immunity is afforded, "unless such informa-

---

**13.** Dr. Schwartz is a physician with 30 years of experience in OB/GYN practice with supervisory experience including service in several professional associations. Attorney Artz has practiced in the field of medical practice legal matters, including medical staff privileges,

since 1992. *See* Dr. Babb's Response in Opposition to Summary Judgment Motion of Defendants, 3/15/11, at 486 (Report of Dr. Schwartz), 495 (Report of Atty. Artz), Appendix III.

tion is false and the person providing it knew that such information was false." *Id.*

The trial court determined that HCQIA immunity did apply to Dr. Oliver and Dr. Chmielewski and stated as follows.

The Court believes that even if Dr. Oliver and Dr. Chmielewski were in fact incorrect about their assertion that Dr. Babb provided inadequate care, it does not mean that they did not believe those assertions.

Trial Court Opinion, 5/12/11, at 6.

In his brief, Dr. Babb does not provide any distinct analysis of the record, showing Dr. Oliver and Dr. Chmielewski did not possess a belief in the veracity of the information they provided to their superiors and to the Fair Hearing Committee. Rather he conflates his argument pertaining to Dr. Oliver and Dr. Chmielewski with his argument concerning Geisinger's presumptive immunity. *See* Dr. Babb's Geisinger Defendants' Brief at 57–61. The expert opinions of Dr. Schwartz and Attorney Artz address the reasonableness of the Fair Hearing Committee's processes and beliefs, not the beliefs of Dr. Oliver and Dr. Chmielewski in the truth of the information they provided. *See* Dr. Babb's Response in Opposition to Summary Judgment Motion of Defendants, 3/15/11, at 486 (Report of Dr. Schwartz), 495 (Report of Atty. Artz), Appendix III. Further, the bulk of Dr. Babb's assertions regarding Dr. Oliver and Dr. Chmielewski pertain to their supposed bias and ulterior motives. As discussed above, such assertions, even if true, are irrelevant to the question of whether HCQIA immunity attaches. As noted by the trial court,

Dr. Oliver and Dr. Chmielewski might not have one hundred percent pure motives when the[y] reported Dr. Babb to the administration, but there is no doubt that they in fact raised patient care issues in those complaints. The Court

will not punish whistleblowers based on the fact that they may have had some self interest in their initial complaint. Trial Court Opinion, 5/12/11, at 6.

After a close review of the record, we conclude the trial court did not err in determining that Dr. Babb failed to establish the existence of a material issue of fact sufficient to preclude HCQIA immunity relative to Dr. Oliver and Dr. Chmielewski. The proffered evidence of Dr. Oliver and Dr. Chmielewski's alleged ulterior motives does not raise a question of whether the information they provided was knowingly false. Dr. Babb offers the opinions of his experts to demonstrate that Geisinger was unwarranted in concluding that the information about Dr. Babb, supplied to it by Dr. Oliver and Dr. Chmielewski, raised patient care issues. This contention is not relevant to the question of whether Dr. Oliver and Dr. Chmielewski provided knowingly false information. Accordingly, we discern no error in the trial court's grant of summary judgment in favor of Dr. Oliver and Dr. Chmielewski on the basis of HCQIA immunity.

We turn finally to a consideration of these issues as they apply to CCH. The position of CCH presents yet a third set of circumstances. Here we are concerned with the reasonableness of CCH's peer review process of Dr. Babb's re-application for clinical privileges and its belief that patient care issues were implicated by the information available to them at the time.

Dr. Babb develops similar arguments to those he raised against Geisinger.

In this case, the treatment of expert opinions by the trial court is particularly at issue, both as to the alleged medical grounds for termination exposed and rebutted in the reports of Dr. Sandridge and Dr. Schwartz, and as to the non-compliance with HCQIA requirements documented by Attorney Artz and Dr. Schwartz.

Dr. Babb's CCH Brief at 55. "CCH did not act in furtherance of quality health care, did not make a reasonable effort to determine the facts, were not fair under the circumstances, and did not act based upon reasonable belief that termination of Dr. Babb was warranted." *Id.* at 57.

Similar to his argument relative to Geisinger, Dr. Babb again references evidence purporting to support his contention that CCH's "[m]alice and retaliatory animus infested the process throughout." *Id.* at 20. We have previously determined these issues are inapposite to the central question at issue here. That is; has Dr. Babb presented sufficient evidence to raise an issue of material fact as to whether CCH's belief that patient care issues existed, and the efforts it made to adduce the facts supporting its belief were reasonable and in compliance with 42 U.S.C.A. § 11112(a)? As above, we discern no error by the trial court in declining to consider evidence of bias and pretext in the context of the applicability of HCQIA immunity to CCH.

The gist of Dr. Babb's remaining argument, relative to CCH, is that the hospital's effort to obtain the facts pertinent to his re-application for clinical privileges was unreasonable. In particular, Dr. Babb faults CCH for acquiescing in Geisinger's insistence that Dr. Babb sign a second release that eliminated the "good faith and without malice" language. *See* n. 6 *supra*. Dr. Babb suggests that CCH should have viewed Geisinger's insistence on a release eliminating the "good faith and without malice" requirement as an admission of bad faith. Dr. Babb's CCH Brief at 64, *quoting* Attorney Artz's Report. Dr. Babb further faults CCH for amending its by-laws, after it received his re-application, to make an applicant responsible for securing access to the information underlying another institution's NPDB report, and declining to consider his evidence rebutting

the report because he failed to supply the information requested from Geisinger. *Id.*

Here, Dr. Babb fails to apply the same objective test he accuses the trial court of ignoring. Dr. Babb argues that the procedures CCH employed in reviewing his re-application were unreasonable in the context of its bias and improper motivation. Unlike the opinions expressed by Dr. Schwartz and Attorney Artz in their respective expert reports pertaining to Geisinger, their opinions relative to the reasonableness of the process and decisions of CCH are entirely dependent upon their conclusions about CCH's bias and motivation. *See* Dr. Babb's Response in Opposition to Summary Judgment Motion of Defendants, 3/15/11, at 486 (Report of Dr. Schwartz), 495 (Report of Atty. Artz), Appendix III. Therein, they do not express an opinion that such procedures and actions are unreasonable absent that context. *Id.*

■ The proper question, as noted above, is whether the procedures are objectively reasonable, or more precisely, whether there exists an issue of material fact sufficient to overcome the presumption of reasonableness. Upon close review of the record, we agree with the trial court that Dr. Babb has failed to proffer relevant evidence that the procedures employed by CCH to ascertain the facts pertinent to his re-application were objectively unreasonable. Accordingly, we discern no error by the trial court in concluding that Dr. Babb has failed to raise an issue of material fact sufficient to overcome the presumption of reasonableness and the applicability of HCQIA immunity to his claims for damages against CCH.

Alternatively, as we noted above, Dr. Babb never requested a Fair Hearing to challenge the findings and conclusions of CCH's Credentials Committee and Medical Executive Committee. Dr. Babb contends that he declined to request a hearing

due to his belief that the result was predetermined and that no additional evidence would be reviewed. Dr. Babb's CCH Brief at 64, *quoting* Attorney Artz's Report. If Dr. Babb's beliefs were correct and he deemed those factors unreasonable, it was nevertheless incumbent on him to test those assertions at the prescribed hearing and not raise them for the first time before the trial court. "We do not believe a plaintiff can deprive defendants of immunity by refusing to participate in the hearing required under [section] 11112(b)(3)." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 638 (3d Cir.1996).

■ As noted, HCQIA immunity applies only to liability for damages. 42 U.S.C.A. § 11111. This immunity extends to damages, not to immunity from suit or from other remedies. "[S]ince the Act does not provide immunity from suit or from injunctive or declaratory relief, plaintiff's claims remain viable to the extent he seeks non-damage remedies." *Mathews v. Lancaster Gen. Hosp.*, 883 F.Supp. 1016, 1035 (E.D.Pa.1995), *affirmed*, 87 F.3d 624 (3d Cir.1996). Thus, HCQIA immunity cannot be the basis for the trial court's grant of summary judgment relative to Dr. Babb's count III, alleging defamation but seeking injunctive relief. Relative to this claim, the trial court held as follows. "[D]ue to the finding that the parties acted properly in their actions against Dr. Babb, the [trial c]ourt finds that Injunctive relief is improper and unavailable." Trial Court Opinion, 5/12/11, at 7. With respect to CCH only, we agree. Dr. Babb, having failed to support his underlying claim and exhaust his legal remedies, is not entitled to injunctive relief against CCH.

With respect to Dr. Babb's remaining allegations of error, although argued in the parties' respective briefs, we again note the trial court did not address or dispose of Geisinger's remaining grounds contained in its summary judgment motion. Accordingly, we decline to address whether there are any contested issues of material fact or whether Geisinger is entitled to summary judgment as a matter of law relative to those remaining issues. Those issues include the status of Dr. Babb's employment, the application of any statute of limitations, the existence of a cause of action for activity outside the peer review process, the *res judicata* or precedential effect of the U.S. District Court's rulings, the applicability of immunity under the PPRPA, and the status of PSGHS. "Resolution of [those] issue[s] requires a thorough review of the materials submitted in support of and in opposition to the motion for summary judgment, which is a task better left to the trial court." *Somers v. Gross*, 393 Pa.Super. 509, 574 A.2d 1056, 1061 n. 4 (1990).

In sum, for all the foregoing reasons, we determine that the trial court erred in granting summary judgment in favor of Geisinger on the basis of HCQIA immunity since there exists an issue of material fact regarding Geisinger's compliance with 42 U.S.C.A. § 11112(a). However, we determine that the trial court committed no error in granting summary judgment in favor of Dr. Oliver, Dr. Chmielewski, and CCH on the basis of HCQIA immunity and failure to raise a proper claim for injunctive relief against CCH. Finally, we decline to review additional issues relative to Geisinger's motion for summary judgment not addressed by the trial court. Accordingly, we reverse that portion of the trial court's May, 12, 2011 order granting Geisinger's motion for summary judgment, vacate the judgment in favor of Geisinger, and remand for further proceedings. The judgments entered in favor of Dr. Oliver, Dr. Chmielewski, and CCH are affirmed.[14]

---

14. Appellees filed a joint petition to dismiss Dr. Babb's appeal on the basis of various

Order reversed in part. Judgment vacated in part. Case remanded. Jurisdiction relinquished.

Judge GANTMAN concurs in the result.

alleged violations of the rules of appellate procedure, specifically with respect to his reproduced record and briefs. While we note with disapproval various deficiencies in this regard on the part of Dr. Babb, we decline under all the circumstances to quash this appeal as we do not deem our review sufficiently hampered thereby.